**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 30, 2020**

# In the Court of Appeals of Georgia

A20A0839. CYNTHIA S. BARRY v. THOMAS S. BARRY, III et al.

RICKMAN, Judge.

Cynthia S. Barry filed a lawsuit purportedly to seek enforcement the Last Will and Testament of Thomas A. Barry ("the Will"), her late father, and to seek an accounting of the Barry Living Trust ("the Trust"), of which both she and her siblings, Thomas S. Barry, III and Pamela G. Berndsen, are the beneficiaries. Following an extensive evidentiary hearing, the trial court determined that Cynthia,[1] a Florida lawyer, was not actually seeking enforcement of the Will or an accounting of the Trust, but was instead engaging in vexatious litigation designed to contest the authority granted to her brother, Thomas, as personal representative of the estate and

---

[1] For the sake of clarity, this opinion will refer to the parties by their first names.

trustee of the Trust. The trial court concluded that in so doing, Cynthia invoked the in terrorem clauses contained in both the Will and the Trust and, consequently, forfeited her beneficial interests derived from both. Because the trial court's factual findings are fully supported by the record and the court did not err in determining that the in terrorem clauses were invoked, we affirm.

Upon appellate review of the trial court's ruling, we will defer to its factual findings and credibility determinations unless they are clearly erroneous. *Fowler v. Cox*, 264 Ga. App. 880, 882 (592 SE2d 510) (2003); see also OCGA § 9-11-52 (a). The clearly erroneous test is the same as the any evidence rule, meaning that the trial court's factual findings will not be disturbed if there is any evidence to support them. See id. at 882-883. We review the trial court's legal conclusions de novo. See generally *Rose v. Waldrip*, 316 Ga. App. 812, 815 (1) (730 SE2d 529) (2012).

The record evidence, which includes the documentary and testimonial evidence presented at the hearing and the trial court's factual findings with respect to that evidence, shows as follows. The parties' father executed the Will in April 2012, and named Thomas as the personal representative of the estate. He and the parties' mother, Lillian V. Barry, first created the Trust in February 1994, and executed the last amendment thereto in April 2012. The original Trust named both Thomas and

2

Cynthia as successor co-trustees in the event of their deaths; in March 2011, however, their parents filed an amendment to the Trust removing Cynthia, leaving Thomas as the sole successor trustee.

On October 17, 2011, the parties' mother died. Two weeks after their mother's death, Cynthia contacted the law firm retained by her father to assist with the Trust and inquired about declaring her father incompetent, noting that there was "much at stake."[2] She also demanded privileged communications between the firm and her father, to which she had no legal right. When the law firm declined to provide them, she threatened the firm with litigation by demanding a copy of its malpractice insurance coverage.[3] The trial court declared Cynthia's actions "unethical, unprofessional[,] and by any standard[,] just plain wrong," and the court concluded that, even at that time, she "was trying to gain control of her father's estate."

---

[2] The parties father lived for another four years after the death of his wife, and there is no other allegation or record evidence of any kind to suggest that he was ever incompetent.

[3] The trial court noted that during the hearing, Cynthia denied having threatened the law firm until she was confronted by the documented evidence, at which time she changed her story. The trial court found that Cynthia's actions in trying to get her father declared incompetent and in threatening her father's law firm were consistent with her planning for future litigation with respect to his estate.

On November 9, 2015, the parties' father died. The very next day, Cynthia sent emails to both Thomas and Pamela, telling them to "Save your money." She also sent an email message to her niece, Pamela's daughter, entitled "Your Mom:Brainwasher," and telling her, "Get ready to fight. You picked the wrong side." Cynthia admitted at the hearing that these messages were intended as threats of litigation.

Following their father's death, Tomas, as personal representative and trustee, prepared to distribute his father's property in accordance with the Will and Trust. The father dealt in precious metals, and the Will bequeathed the father's Perth Mint Certificates to his three children, to be equally divided among them, and placed the rest of his property, real and personal, into the Trust ("the Trust Estate"). The Trust, in turn, directed that the Trust Estate be divided into separate shares of equal market value and distributed equally among the three children. The relevant assets in the Trust Estate included the parents' residence, a coin collection, Merrill Lynch stock, and personal belongings contained in the home.[4]

---

[4] Cynthia also insisted that their father had an additional $800,000 worth of gold bullion/bars that he kept in his safe, and suggested that Pamela had stolen the gold and destroyed evidence of it. Both Thomas and Pamela testified that they had never seen or heard of the existence of any such gold, and the trial court concluded that,

> [Cynthia] sent multiple third party subpoenas and was given thousands

Significantly, the Trust provided that Thomas, as trustee, had the unfettered discretion to value and distribute the assets of the Trust Estate:

> [Thomas] shall have the power to make any distribution or payment in kind or in cash or partly in kind and partly in cash and to cause any share to be composed of cash, property, or undivided interests in property different in kind from any other share, either pro rata or non pro rata, without regard to differences in the tax basis of such property and without the requirement of making any adjustment of the shares by reason of any action taken pursuant hereto.
>
> Any division, allocation, apportionment or valuation of the property to distribute the assets to or among any of the trusts or beneficiaries shall be made by [Thomas], and the good faith determination of [Thomas] shall be binding and conclusive on all parties.

---

of pages of discovery and could still not provide a single shred of evidence that $800,000.00 worth of gold bullion/bars existed except the claim of [Cynthia]. It should also be noted that this was not mentioned in [Cynthia's] testimony on direct or in any of her expert's testimony either. The [trial court] sees this claim as what it is, a fictitious declaration by [Cynthia] to use as an excuse why she deserved an equitable accounting so quickly after her father's death . . .

Thomas was granted the same authority with respect to the disposition of the stocks held in the Trust estate:

> [Thomas] shall have the power to acquire, grant or dispose of property, including puts, calls and options (including options on stock owned by the estate), for cash or on credit, including maintaining margin accounts with brokers, at public or private sale, upon such terms and conditions as the fiduciary may deem advisable; and to manage, develop, improve, exchange, partition, change the character of, abandon property or any interest therein, or otherwise deal with property.

At the time of his father's death, Thomas lived in Maine, and was the primary caregiver for his wife who had recently undergone a leg amputation.[5] Because of the distance, he did not have immediate access to the assets or financial records of his father, and his father left no written inventory or prior accountings when he passed. Nevertheless, Thomas sent Cynthia a letter on December 22, 2015, informing her that he was beginning the process of gathering documentation in order to prepare a report on the Trust Estate. Thomas relied on Pamela, who had lived with and cared for their father for the last four years of his life, to locate and send him relevant documents and

---

[5] Thomas was a paramedic and was permitted to care for his wife so that she would need to attend only weekly rather than daily appointments with a nurse or a doctor.

records. On January 27, 2016, less than 90 days after their father's passing, Thomas had prepared and provided to his siblings a preliminary accounting of all of the assets and liabilities of the Trust Estate, and informed them that he planned to offer the Will for probate "early next week."

Thomas then attempted to hire two different local lawyers in their father's small town for the purpose of offering the Will for probate. Cynthia, however, had already contacted each — but retained neither — and provided just enough information to preclude them from representing Thomas and/or the Estate without creating a conflict of interest. She then raised a conflict of interest with respect to their representation, which she refused to waive; each attorney then declined to assist Thomas. The trial court explicitly held that this was "a pre-emptive strike to preclude the limited number of [a]ttorneys available" from being able to work on Thomas's behalf.

Meanwhile, Cynthia filed the instant lawsuit on February 26, 2016, less than four months after their father's death. The complaint alleged that Thomas "refuse[d] to file the [W]ill" and "refused to provide adequate information about the specific assets and liabilities of the [Trust]." She sought affirmative injunctive relief requiring Thomas to file the Will; an equitable accounting of the Trust Estate; and affirmative

7

injunctive relief prohibiting Thomas from making any distributions from the Trust Estate until the completion of the equitable accounting that she demanded.

Contrary to the allegations made in the complaint, the trial court concluded that Cynthia, not Thomas, "delayed the filing of the [W]ill," and noted that Thomas made "significant strides to obtain financial information and notify the beneficiaries of progress" in the less than four months between their father's passing and the filing of the lawsuit, despite him living out of state, him being the primary caregiver for his wife, and it being the winter holiday season. Thomas had prepared the preliminary accounting, listing all of the Trust Estate's assets and liabilities, and assigned an approximated value for each. Additionally, he had obtained a new appraisal on the residence as of the date of his father's death;[6] provided an inventory of their father's coin collection; provided information regarding the Merrill Lynch stocks; and contacted the life insurance and annuity companies with whom his father had accounts to inform them of his father's death, and provided information to the contractual beneficiaries on how to obtain payment under the policies.

---

[6] The appraisal Thomas used in the preliminary accounting was one his father had obtained in 2012.

Thomas also continued to supply Cynthia with information and documentation even after she filed the lawsuit, actively attempting to resolve the dispute without the need for court intervention.

Once he located a local attorney who would assist him in probating the Will, he attempted to distribute the Perth Mint Certificates equally between himself and his siblings in accordance with its terms. Doing so required the establishment of three separate accounts, one for each beneficiary. Despite Thomas having sent Cynthia the paperwork and information and instructing her to open the necessary account, Cynthia electively stalled the process, claiming she first "wanted ultimate resolution of the case."

Thomas also kept a detailed and running inventory of the Trust Estate and all receipts and disbursements. He proposed a strategy to distribute the coin collection that involved an in-kind distribution of the coins that could be evenly divided, and then engaged a professional coin trader to value the remaining coins for an equitable cash value distribution; although he was under no duty to do so, he sought Cynthia's input on the proposal. He obtained and then provided information on the Merrill Lynch stock and again, although he was under no duty to do so, inquired as to whether Cynthia would prefer an in-kind or cash value distribution of her stock.

Finally, he attempted to schedule a date and time to allow an opportunity for Cynthia to walk through the home with himself and Pamela in order to identify what personal belongings she wanted to take.

Cynthia, on the other hand, was steadfast in her claims that Thomas's accounting was inadequate, and persistently challenged his actions. Despite the fact that Thomas had obtained a new appraisal on the residence after their father's death, Cynthia hired her own appraiser who assigned the home a greater value and insisted Thomas's was inaccurate. The trial court discounted Cynthia's appraisal, which used non-comparable homes and "seemed to have a singular purpose of valuing the home of the estate as high as possible so that [Cynthia] would have a larger cash share of the inheritance." The trial court then concluded that Cynthia "used differences of opinion between experts as to valuation of the home as a justification for her complaint," when in fact she was contesting the power granted to Thomas by the provisions of the Trust.

Cynthia refused to respond to Thomas's inquires seeking input related to his proposed distribution of the coin collection. But she nevertheless contested his authority to make an in-kind distribution and challenged his valuation of the remaining coins despite the fact that he had engaged a professional coin dealer. The

trial court concluded, "[i]t seems that [Cynthia] is looking for any excuse to contest decisions made by [Thomas]" and that "[t]he numerous contests are in direct conflict with the plain language of the [T]rust."

Cynthia refused to respond to Thomas's inquiry as to whether she preferred an in-kind or cash value distribution of the Merrill Lynch stock. After waiting more than a year and receiving no response, he sold the stock, which had realized a gain of more than $200,000 since the date of their father's death. Cynthia claimed that Thomas breached his fiduciary duty by selling, apparently because it continued to increase in value. Noting that the plain language of the Trust gave Thomas the authority to sell the stock, a fact which Cynthia admitted, the trial court concluded that "by claiming damages based on this transaction and/or the lack of permission given," she was "contesting the provisions of this Trust."

And finally, Thomas attempted to schedule a time for the three siblings to meet at the house and divide the personal property. Cynthia refused to participate, and then insisted that Thomas failed to provide her with an inventory of the home. As stated by the trial court, "[Cynthia] was given an opportunity to literally walk through the house and get what she wanted from it. She waived any right to object by her overt inaction."

At the conclusion of the hearing, the trial court held that Cynthia's claims were brought "with malice, without substantial justification, [and] in bad faith," and were "merely a pretext to substitute her opinion as beneficiary over that of the determination of the Trustee." The court continued,

> While [Cynthia], who is a licensed . . . [a]ttorney, has carefully avoided contesting the entirety of the [Will or Trust], she has clearly contested several provisions in an effort to thwart [Thomas's] administration of the [T]rust and gain a personal advantage. She has contested his good faith value regarding the house; she has contested [his] authority to take possession of the coin collection without her being present; she has contested [his] proposed in-kind division of bulk coins; she has contested his proposed procedure to distribute the personal property in-kind; she has contested his good faith valuation of miscellaneous coins; she has contested his authority to liquidate investments . . .
>
> . . .
>
> [Cynthia] has not only contested the validity of the [Will and Trust,] but has instituted a proceeding to prevent the provisions from being carried out in accordance with their terms. . . . Making up claims and misrepresenting the facts to try and fool the [trial court] into finding that [Thomas] is [breaching] his fiduciary duty is directly contesting the validity of [his] appointment as [Personal Representative and Trustee]."

The trial court concluded that by her actions, Cynthia invoked the in terrorem clauses contained in both the Will and the Trust and, therefore, forfeited her beneficial interests derived from both.

On appeal, Cynthia argues the trial court erred, and continues to insist that she seeks nothing more than "an accounting of the [Trust]." The trial court did not err.

In terrorem clauses are valid and enforceable in Georgia, provided that the disposition of the property upon a violation is otherwise clear. See OCGA §§ 53-4-68 (b);[7] 53-12-22 (b); see also *Duncan v. Rawls*, 345 Ga. App. 345, 348 (1) (a) (812 SE2d 647) (2018).

As Cynthia correctly asserts, a petition for accounting does not constitute a contest to a will or a trust, because it first affirms the validity of those instruments "in order to enforce a disposition of the estate in accordance with its terms." *Sinclair v. Sinclair*, 284 Ga. 500, 502 (2) (670 SE2d 59) (2008); see also *Snook v. Sessoms*, 256

---

[7] Effective January 1, 2021, the statute was amended to comport with common law and expressly provide that an in terrorem clause shall not be enforceable against a person bringing an action for an accounting. Ga. L. 2020, Act 508, § 1-15; see generally *Sinclair v. Sinclair*, 284 Ga. 500, 502-503 (2) (670 SE2d 59) (2008).The amended statute also provides that an in terrorem clause shall not be enforceable against a person bringing an action for the interpretation or enforcement of a will; bringing an action for removal or for other relief against a personal representative; or entering into a settlement agreement. See id.

Ga. 482, 482 (350 SE2d 237) (1986) ("A beneficiary assuredly is empowered to enforce the provisions of a trust, no matter the terms of any in terrorem clause.") (emphasis omitted.). See generally OCGA § 53-12-243 (a). However, neither the trial court nor this Court is confined by the nomenclature used in any particular cause of action, nor will we turn blind eye to one's actual intent. See *In re Estate of Johnson*, 352 Ga. App. 164, 167 (834 SE2d 283) (2019) (holding that although the plaintiffs contended that they sought only an interpretation of the will, their proposed declaratory judgment action made it clear that their actual intent was to contest a provision of the will and, thus, their action would trigger the in terrorem clause); see also *Sinclair v. Sinclair*, 284 Ga. 500, 503 (2) (670 SE2d 59) (2008) (holding that "[a] beneficiary assuredly is empowered to enforce the provisions of a will, no matter the terms of any in terrorem clause," but nevertheless recognizing that the beneficiary "could conceivably choose to risk a forfeiture of his interest under the will by requesting relief beyond that which is outlined in his complaint . . .") (citation, punctuation, and emphasis omitted). Giving deference to the trial court's factual findings, one need not go beyond the plain language of the provisions themselves to conclude that Cynthia triggered the in terrorem clauses of both the Will and Trust.

(a) The Will contained the following provision:

14

> If any beneficiary under this Will contests its validity or the validity of any of its provisions, or institutes any proceeding to prevent this Will or any of its provisions from being carried out in accordance with its terms, whether or not in good faith and with probable cause, then all benefits for such beneficiary in this Will are revoked and annulled and the benefits which such beneficiary would have received shall go to the residuary beneficiaries of this Will other than such contesting beneficiary.

The trial court determined that by preemptively contacting local probate lawyers for the purpose of creating a conflict of interest, Cynthia delayed Thomas's ability to offer the Will to probate. She then refused to complete the necessary paperwork in order to allow him to equally distribute the Perth Mint Certificates in accordance with the terms of the Will, all the while maintaining a frivolous lawsuit as a pretext to challenge his authority as personal representative. The trial court did not err in concluding that in doing so, Cynthia contested the validity of the Will's provisions and/or instituted a proceeding to prevent the Will from being carried out in accordance with its terms. See OCGA § 53-4-68 (b); *In re Estate of Johnson*, 352 Ga. App. at 167. Cf. *Norman v. Gober*, 292 Ga. 351, 355 (737 SE2d 309) (2013) (holding that although the caveat to a will was filed by a child, when "it appear[ed] possible that one or more of the beneficiaries of the [w]ill sought to destroy it," the

15

co-executors were entitled "to determine whether the caveat can and should be attributed to other beneficiaries before distributing the assets from the estate" and, if so, "whether the in terrorem clause [could] be applied" to those unnamed parties").

(b) The Trust provided that,

If any person or entity, other than one of us [i.e., the parents], singularly, or in conjunction with any other person or entity, directly or indirectly, contests in any court the validity of this agreement, including any amendments thereto, then the right of that person or entity to take any interest in the trust property shall cease, and that person or entity shall be deemed to have predeceased both of us.

The Trust gave Thomas alone the authority to value the Trust Estate, and granted him the power to divide the interests "in kind or in cash" or any combination thereof. It further directed that Thomas's good faith decisions with regard to the distributions "shall be binding and conclusive on all parties."

Yet, as the trial court held, Cynthia filed a lawsuit pursuant to which she repeatedly, relentlessly, and in bad faith contested Thomas's actions made pursuant to the authority granted him by the Trust. Indeed, the trial court determined that the lawsuit "was manufactured by [Cynthia] as an attempt to become the trustee and have her way instituted by [the trial court]." Faced with this evidence, the trial court did

16

not err in concluding that Cynthia, at least indirectly, contested the validity of those provisions of the Trust that named Thomas trustee and granted him the authority to value and divide the Trust. Because its findings in that regard are supported by the record, the court did not err by holding that Cynthia invoked the in terrorem clause. See OCGA § 53-12-22 (b). Cf. *In re Estate of Johnson*, 352 Ga. App. 164, 167 (834 SE2d 283) (2019).

For these reasons, we affirm the trial court's holding that Cynthia forfeited her beneficial interests derived from both the Will and the Trust. OCGA § 53-4-68 (b); § 53-12-22 (b).

*Judgment affirmed. Dillard, P. J., and Brown, J., concur.*